This case on the docket, 2-17-0556, Fiala v. Wasco Sanitary District at Hall, Defendant Athelene. Argument on behalf of the defendant's appellant, Mr. James P. Newman. Argument on behalf of the defendant's appellant, Wasco Sanitary District, Mr. Donald P. Eckert. Argument on behalf of the defendant's appellant, Mr. Robert Braswell, Mr. Joel B. Bartoki. Mr. Newman. Can I please have the court? This is our third time here before the unparticipated court on this issue. And I'm sure that your honors have read the briefs and I know some of you have been on the bench when we've been up here before. So I don't need to probably go over a lot of the facts, but I do want to very briefly go over the procedural history of where we are and why we're here. This case was originally filed in federal court and the complaint alleged in the alternative either a RICO violation or state law violations. The federal court found that there was no RICO violations and remanded the state law claims back here. For the last 10 years, this case has been for 10 years, we do not have, we're not at issue on the plea. We do not have an answer to the complaint with the exception of the Wasco Sanitary District who was ordered to answer the complaint following the second appeal. Or the first appeal, excuse me. But for the 10 years, the defendants have taken the position, not only in their pleadings in front of court and in the pleadings they filed, their briefs, that the Sanitary District was obligated to reimburse the defendants, what we call the B&B defendants, the developers, for money that they spent to create the district. That's been their position for 10 years. Except approximately a year ago, the Wasco Sanitary District filed a counter complaint in which they alleged that there was a statutory provision, which is section 8 of the Sanitary District Act, that required them to provide reimbursement, but they didn't want to call it reimbursement. When you said they, you mean the district? The district, yes. Apologize. That the district was obligated to do that. So there were cross motions for summary judgment filed. Fiala, my client, we filed a motion for summary judgment on, partial summary judgment on two issues. That there is no reimbursement agreement and that the trustees had a conflict of interest. So anything that they voted on, as it relates to the B&B defendants, would be void as a matter of law pursuant to statute. Interestingly, the trial court found that there was no reimbursement agreement, but denied Fiala's motion. I don't know why, but the parties, the defendants have gotten off the idea that there's a valid reimbursement agreement. Even though the Wasco Sanitary District's own counter-complaint makes such allegations, which is what prompted the motion for partial summary judgment. Instead, the trial court granted summary judgment for the sanitary district on specifically that section 8 of the Sanitary District Act. A lot gave them the authority to do so. So there are three issues really before the court now that are primary. One is, did the Wasco Sanitary District have the authority to permit the defendants to collect and keep the connection fees? Did they have the authority? Two, if they did have the authority, did the Wasco Sanitary District ever exercise that authority? In other words, did they ever enter into any type of agreement with the B&B defendants? And the third issue is, if the first two did occur, was there a conflict of interest, which would void any agreement that they entered into? Our position in this case from day one has always been that none of those apply. They did not have the authority, there is no agreement, and any agreement that they may have entered into would be void. Before 1997, specifically in 1994, was there anything on the books that would have said you shall not do this? You shall not allow B&B or FMAA, whichever one, to build the facilities and then let them be reimbursed or give them some element of payback? Was there anything that said they couldn't do that? The answer is yes and no, and here's why. There are, I believe, four different sanitary district acts. Two of the acts, not this one, permitted reimbursement. They had a specific provision in there for reimbursement. Before 1997? Correct. Okay. So these two acts did. The act here did not. The act was amended to add reimbursement, which, of course, the act of amending it to add it would mean that it wasn't permitted in 1994, because otherwise they would not have to have amended it to put it in there. And the statutory, the common law exclusion by inclusion principle, which I cite in my brief, means, to answer your question, that because it was in one act and not in this act, it is prohibited. That's the way the statutory construction would work. Well, there's another way, too, but it's not in Latin, and I will leave the Latin to my colleague McLaren here. It's that it was an oversight and needed to be clarified. Does that mean it was then not allowed prior to that time, or they are just now clarifying what should be happening? Well, that oversight would have been on the books for, if my math is right, a little over 75 years. Well, okay, so I would say that I don't know that that's an oversight. What do the words or otherwise mean? What do you mean or otherwise? Well, Section 8 of the Sanitary District Act of 1936 says that the sanitary district shall proceed as rapidly as is reasonably possible by construction, purchase, lease, or otherwise to provide sewers and a plant and treatment and all that kind of stuff. What does or otherwise mean? How broad is or otherwise? Well, I can tell you how broad it's not. Well, tell me how broad it is first, and then tell me how broad it's not. Frankly, I think that's vague from a statutory construction term or otherwise, because as one of the defendants here actually citing that exact language, Your Honor, said, and I believe he's the counsel that's going to be arguing today, made a comment in open court that's in the record and said that that is so broad that if the sanitary district wanted to rob a liquor store, they could. That's what he said on the record. I can tell you it's not that broad. And when you have an attorney making such a representation to the court, I would say that that's just, that this is so overbroad and to the point of ambiguous. The reason we know it doesn't mean reimbursement is because the legislature would never have added a provision that permitted reimbursement if that meant reimbursement. It would render the entirety of Section 8.1 superfluous. And, of course, another principle of statutory construction, the courts are not allowed to read one provision that renders another superfluous. But more importantly— But does the amendment actually make the activity that occurred prior to that amendment illegal or— I mean, because that's a term that gets thrown around at the trial court a lot, illegal, whatever. Does it make it illegal or ill-advised? It would make it illegal in the sense that it wouldn't be permitted by law. But the point I make in my brief, and I've made this from day one, is Section 8 has no application to this case whatsoever. And that's what I'm asking this court to find. And why not? This is a sanitary district. That's right. But Section 8, the only thing that Section 8 applies to is the creation of the FOXMail annexation agreement. That is the—this is the statutory authority for B&B to enter into an agreement with a sanitary district in 1994. That's what that section is. What it doesn't say—what it doesn't say, because if you— Again, the plain language. What this—what Section 8 doesn't provide is, after the parties enter into an agreement, that the districts can give away public property. Because that's what we're here for today. We're—nobody—I have never—the FIA has never attacked the 1994 annexation agreement, contrary to what every defendant has argued from day one. I've even put it in my complaint. Point blank. We are not attacking the annexation agreement. When was the property been dedicated to—what were the facilities, pardon me, dedicated? So what happened here was— What's the public property you're talking about? Are you talking about money or are you talking about land? We're talking about—we're talking about money and the permits that the sanitary district has. The public property was identified in FIA 1, the first appeal, where this court found that the complaint adequately alleged a cause of action for the taking of public property under the Public Trust Doctrine. That was the first appeal that came up. And your position relative to your request for summary judgment is, is that there are no unconconverted facts that, as a matter of law, you're entitled to judgment? I'm entitled to partial summary judgment on the issue that there's no reimbursement agreement. The parties—the parties that will step before you today, you're going to have the sanitary district that's going to come up and say there is no reimbursement agreement, and you're going to have the defendants come up and say there is no reimbursement agreement. You're going to have the trial court below making a finding that there is no reimbursement agreement. There is no reimbursement agreement. There's no agreement at all. It was literally behind closed doors, money going back and forth. That's why Section 8 doesn't apply. Section 8 only deals with the initial action of the sanitary district to create the district. And what happened here is the B&B purchased 1,000 acres of land, which is basically the Fox Mill development that you see in the brief, and they didn't want to use—they didn't want to use well and septic, so they wanted the sanitary district to come in. But the sanitary district didn't have the infrastructure. So pursuant to Section 8, they went to the sanitary district and said, we want to build Fox Mill, and the sanitary district said, great, then you'll have to pay for the infrastructure. And that's the annexation agreement, the 1994 annexation agreement. B&B purchased a specific amount of permits for a specific amount of homes that are attached to the homes in exchange for building the infrastructure up in the sanitary district. According to the sanitary district records, it's part of the record on appeal here, that equated to a little over $1.2 million because they were required to submit the bills to the sanitary district, and that's all the sanitary district has. Meanwhile, the B&B has collected over $12 million and has profit. And in fact, they're proud of it. They'll tell you, we're collecting these fees to make profit. Nothing prevents us from making profit. The law prevents them from making profit. They're selling—they're taking public property and selling it for profit. That money belongs to the district. It belongs to my client as a member of the district. It is public property. It cannot be taken and transferred to a corporation to make profit out of. The district got nothing out of that. If there were an agreement for reimbursement, would it be authorized then for them to transfer something, anything in kind or in specie in order to reimburse them for their costs? Well, in 1994, a reimbursement agreement would not have been permitted. Plus, in 1994, when the agreement was signed, no reimbursement agreement was ever entered into. The parties entered into the annexation agreement, and B&B agreed to build this in exchange for, I think, 765 permits, whatever the number is that's in the brief. That's a contract. That's all it is. It's a contract for, you know, I'm going to pay $1.2 million. I get 800 connection permits. That's all the annexation agreement is. What has happened here is after the fact, B&B placed their family members and their employees on the board for the sanitary district and then siphoned off all of the connection fees for both sewer and water, which are completely different from one another, a fact that the trial court below ignored and the defendants here have ignored. And they siphoned all that money off and it went around the sanitary district. It didn't go through the sanitary district, and the sanitary district didn't get the money and then pay some type of reimbursement for the cost. Instead, all that money went around the district. The district has zero records, you'll hear today, and it's in the record as well, of any payments that were made as a result of this. The only way we found this out is because the records that the district does have is a connection application that says on the application that the sanitary district created, you have to pay B&B a connection fee before we will allow you to join the district. And that connection fee varied. But by our calculations, it's over $12 million. All right, but so this contract in 1994, the annexation agreement, they get 785 permits. I mean, there are a couple of ways that they could use those. Number one, they could tack what they felt was an appropriate amount of money onto the actual purchase of a lot. Yes. Or why couldn't they say you're going to purchase a lot, but you also have to purchase a connection fee, or you also have to purchase your ability to connect by paying us X amount of dollars because we have the permits. Okay, the first one is correct, and that's what I put in my brief. That's the way every business gets reimbursed for their expenses. They would add it on their cost. But the second scenario you gave is a little trickier because what is important here is the annexation agreement specifically says that the connection permits run with the land. So they have to be attached to the land. So one of the things that the sanitary, and you can ask the sanitary district this when you have an opportunity to ask them questions. Could they remove the permit, the three PEs from a lot in Fox Mill and sell it to Hank Harrison? And the answer to that question is no because that land in Fox Mill has already recorded on it the covenants for this. So those PEs run with the land. So there's no way they could sell it. What do you mean when you say they run with the land? They're attached to the land. They've been recorded on the property, and when you buy that piece of property and build it, they're there. You are required under those covenants to use the sanitary district. You are not allowed to dig a well. You are not allowed to put a septic system in it. And it's for free? No. It's not a matter of it being for free. I have never had an issue with B&B selling their land for whatever they want to sell their land for. What they did here, it wasn't a matter of for free. What they did is they assert the fee that the sanitary district passed, put in place by ordinance, which is this part here. And by the way, very important, that was passed by the sanitary district after the 1994 annexation agreement, after B&B. Put it another way, what's the significance of having it run with the land? Because it couldn't be separated. What's the significance of it not being able to be separated? Then they would not be able to. So, for example, Harrison. Hank Harrison just purchased, or not just purchased, but part of the complaint, I think he purchased 100 permits. The record speaks for how many it is. Maybe let's get real clear. Was it when he purchased, when he paid the money, we'll call it that, was he dealing with the initial 785 or were there additional, was there additional infrastructure that had to be created that covered his property and he got 100 of the permits for that property? He got, you're talking about Harrison? Yes. Harrison ended in an agreement with B&B. And in that agreement with B&B, they purchased connection permits and PEs, which are basically the same. Three PEs is a connection permit. Were they part of the 785 or were they newly created? That's the tricky part. What they did, and here's the answer to the question, what the sanitary district did while under the control of B&B is they looked at all of the PEs that were part of Hawks Mill. And I'm going to make up the number because I don't remember the exact amount, but I think it was somewhere around 2,100 PEs that were assigned to the lot, running with the land. This is where this comes into play. Every lot has three. And they looked and they said, well, you know what? Ed Fiala, as an example, is only using two. So we're going to take one because he's only using two. They took one of those. And they took one here and they took one there. And this is B&B doing this. The documents, the record shows B&B doing the calculations and then submitting it to the sanitary district saying, we owe this many more PEs and we're going to sell them. We're going to sell the permits. They're not permitted to do that. Ed Fiala purchases property and the PEs run with the land. They stay with that land in perpetuity. You can't take them. And even if they could be taken, that's the million-dollar question. How did it, and no one's answered this, how did B&B suddenly get possession of all of those PEs that were in Hawks Mill? There's no document out there that says, here you go, other than, I should say no documents, there are some documents out there that seem to suggest that the sanitary district was giving those away without any consideration. Am I correct in concluding that your argument is, is not only has money been paid improperly to B&B, but B&B has converted permits from third parties who own property in the area, and it really has nothing to do with the conversion of those permits, really does not relate to any relationship between the district and B&B, because supposedly Mr. Fiala and others like him are having their property taken from them by B&B, whereas before you were arguing that B&B was taking money from the district. So you're really talking about two types of conversion or takings, one against private parties and one against the district. The private property taking was the, has already been adjudicated. That was the alternative argument that was made in the original complaint dealing with RICO. So we're only dealing with the public aspect of it, because I put those in the alternative because the evidence that I had at that point, and still have, was that they were, that the position of the B&B and the Bosco Sanitary District defendants was that it wasn't public, it belonged to the individuals, to the property. They've gone, the records in this case, they're flowing back and forth. That's why I put them in the alternative. And when the court ruled it's no RICO, there's not a RICO violation, now we're dealing with, because the federal court found that it wasn't a personal property, the connection permit was basically access, and said no RICO claim. So that's what we're dealing with. So to get back to the question you asked, the fees that are at issue here are the connection fees that the sanitary district was charging by ordinance for both water and sewer, and there's nothing in the record that allows B&B to take those fees. And the sanitary district, through the corrupt trustees, that we refer to the three trustees that are all part of the B&B family, all diverted those funds, and they never even came through the sanitary district, which is why they have no records of it. But they also never voted on it. The sanitary district never had a public meeting and said, we're going to give B&B 100 PEs. They didn't do that. Instead, they created a document, which is part of the record, and allowed that money to be funded around the watchful eyes of a FOIA attempt. I can't FOIA those records from a private individual. I know that they exist. So... Your time is up. Okay. You'll have a chance to make a vote. Thank you. Is it Mr. Eckler who's going first? Yes, sir. Thank you, and may it please the Court. My name is Patrick Eckler. I represent the Wasco Sanitary District. Did you say Patrick? Yes, Your Honor. I go by my middle name, unfortunately, Judge. I see. So the P stands for Patrick, not Donald. It does, Judge. It does. My first name is Donald. Yes, Judge. The question before this Court is whether it will allow the rate payers of the district, who I represent, and indeed the district itself, to discover what occurred with respect to the monies that were allegedly collected by the defendants through the collection of connection fees. I want to address one of the issues Your Honor asked about with respect to the connection fee. As attached to our brief in support of the plaintiff's motions below, we attached the ordinance from 1995, where we attached the affidavit of Mr. Folks. And what that ordinance sets forth, Your Honor, is what the connection fee is and how it's to be collected. It's to be collected by the district. That was passed in the annexation agreements in 1994, and the ordinance was passed in 1995 before the alleged conflicts come into existence. And it sets forth how this is supposed to be done. Oh, that's not what happened. And the relevance of Mr. Folks' affidavit is it sets forth we've looked. When the previous, as the court is aware, previously the district stood in opposition to the plaintiff in this case. Following an election in November of 2016 and at a board meeting in December of 2016, at which point there were no defendants that were also members of the board of trustees of the district, the district took, among its first actions it took, was to change its position in this litigation. How many defendants came to the board at one time? There was at least one. But not in 1994? I believe the allegations in the complaint, I believe, are the first one came on the board in 2001, perhaps as early as 1998, Your Honor. And through November of 2016, there was at least one defendant who was a member of the district, Your Honor, and at some point there may have been two, Judge. But to add to the relevance of that, Your Honor, as we cite in our brief and as spoken about by Mr. Newman, is that actions taken by the board while there is a conflict are void. What we need to do is get to the bottom of that. That's the issue here. Not only has the complaint not been answered, but discovery has not been conducted to determine if the repairs have a right to go this, Your Honor. That is the issue. I want to speak to another issue in my limited time with respect to the motion to strike the district's brief. There is no basis to strike the district's brief. The district did not have to file a cross-appeal. We are not making arguments or challenging orders in addition to what the plaintiff is challenging. And the cases cited by the other affidavits don't stand for the proposition that our brief should be stricken. We would ask... Well, I have a question. Yes, Judge. There was at some point in time, if I've considered the record properly, a construction and reimbursement agreement that was filed after or entered into after 1997. Yes, Judge. All right. That's true, correct? I believe that is true, yes. And that dealt with Prairie Lakes parcel in Fox Creek, which might be another 34-acre parcel somewhere around this original 1,000 acres? I believe, yes, Judge. Okay. But at some point in time, B&B said, no, that's okay. We're going to do this our way. We're not going to have you pay the district. We're going to just have you pay us. By what authority did they do that? It is our belief that they didn't have the authority to do that, Judge, and that's what we want to get to the bottom of, and that's why we asked this court to reverse the orders of the trial court and send this back. What does Wasco actually want at this time? I know what you just said, but what's the endgame here? The endgame, Judge, is to get to the truth. The endgame, Judge, is to figure out, is there money that properly should have gone to the district that went to those that didn't have a right to collect it? That's the endgame, Judge. And is there going to be some effort to actually try to collect that? If the court determines that that was improperly collected, if that happens, then I think the first step that has to be taken to determine who's wrongfully pregnant, and that's the opportunity the district is asking for this court to give. And, of course, early on in the litigation, Wasco's position was, we didn't do anything illegal here. We can do everything we did. We have the ordinances. We have the agreements. We have the votes. We're good. That was the position at a time when the district was controlled by the feds. I just want to be clear, based upon what you're arguing, you really haven't said it in the way in which the bells and whistles go off, and that is that when you say we want to get, I think you said, to the bottom of the truth. Yes, Judge. That either implies or incurs that you believe that there are material issues of fact. Is that correct? And we believe there are material issues of fact, Judge, and I think that the affidavit of Mr. Folks points to, so we went to the district administrator. We asked him, do these items exist? Did this ever occur? Did this ever get discussed? And the answer was no. And do you need this information in order to, what, to answer the complaint? No. The district has answered the complaint. If you don't know what's going on, how can you answer it? No. What we want is did the ---- I don't want to sound childish, but it just seems like if you want to get to the bottom of the truth and you don't know what the truth is, then how can you certify what the truth is in an answer? Well, the answer to a prior iteration, not to the current iteration of the complaint, Your Honor, the issue is that I did not prepare the answers, prepared by prior counsel, first of all. Second of all, the issues are what we're trying to get at is, is what the plaintiff alleged true? That's the issue, Judge.  Any other questions? No. Thank you. Mr. Bertocchi. Thank you. Good morning, Your Honor. Joel Bertocchi on behalf of the remaining appellees, although their counsel are present if there's any particular question the court wants to direct to them. I want to start with the motion to strike Mr. Eckler talked about. There are three problems with his argument about why he should not be heard. The first is that the cases don't say you cannot ---- that we cite it, don't say you cannot be heard. And you can argue whatever you want as long as somebody has filed a notice of appeal challenging the judgment. The cases say you cannot be heard if you want to question the judgment and don't file a notice of appeal. And it would be a very difficult thing to manage an appeal if the rule that Mr. Eckler says is the rule was the rule. Because a notice of appeal is a notice. It's supposed to tell everybody right at the beginning of the case, I'm attacking the judgment. I want the judgment changed. Sometimes modified, in this case reversed. Now, Mr. Eckler isn't actually asking for the same thing Mr. Newman is asking for. Mr. Eckler is asking that judgment be entered in favor of Mr. Newman. That's what it says in his brief. Mr. Newman is only asking to have the Fifth Amendment complaint reinstated. But it is a classic case of the need to file a notice of appeal if you're going to identify yourself as a party that is attacking the judgment. And here you see the consequence of why this rule is no good for managing appeals. Because Mr. Eckler filed a brief that we've never had the opportunity to respond to. Because he filed a brief urging reversal as an appellee. Now, it doesn't really matter because his arguments are pretty much the same as Mr. Newman's. But that would not be the way to run an appeal. Well, since they are pretty much the same as Mr. Newman's, although Mr. Newman is, you said, to enter judgment on Mr. Newman's or it's Mr. Fiat's order ultimately. Right. I'm sorry. You know what the issues are. You're not surprised. No, I'm not claiming that. But although there are things we would have responded to if we'd had the opportunity. But the cases say if you don't file a notice of appeal when you want the judgment changed, you should not be heard. They don't say you can piggyback on somebody else's case. Doesn't that assume that the individual at the time that would have filed the notice of appeal remains the same individual? And unlike the seven faces of E, we're not dealing with a different personality where in fact we seem to be dealing with a different personality. Oh, Mr. Eckler and his board were in place when it was time to file a notice of appeal in this case. When Mr. Newman filed an appeal for the dismissal of a Fifth Amendment complaint, nothing has changed since then. All the changes that we referred to that happened at the end of 2016 were before that. So it was just the one face of E that was required to file the notice of appeal. Well, the entity is the same, correct? The entity is the same. The entity has not changed. Right. The people behind the curtain have changed. Right. But they had the opportunity and they had the motive and they had the requirement and they didn't do it. So they shouldn't be heard. That's what the cases say. Going on to Mr. Newman's arguments, and some agree with Mr. Eckler on the merits. Section 8, as Justice Fentz's question suggested, is as broad as it could be. And Section 8 remains on the books. It is not limited, partially, or even entirely repealed by Section 8.1, the section Mr. Newman relies on. Section 8 and its or otherwise language could not be broader. Could I interrupt you? Of course. Could I clarify what appears to be a difference of opinion as between you and Mr. Newman, which is that you believe that Section 8 partially applies in this situation, whereas he does not. Right. There is no indication in Section 8 that it would not cover the arrangement that was made in 1994 when, by the way, Mr. Muscarello and the three trustees weren't on the board at all. Three other trustees and another lawyer advised them on that. So we weren't around then. That arrangement, where connection permits were assigned, were traded for a facility the district could not have built by itself, falls well within the or otherwise language. And now I get to take about 30 seconds and talk about the liquor store. Because, as some people know, I'm given to rhetorical flourishes. And here is what I meant when I said that to Judge Newman. I was trying to illustrate in a graphic way the breadth of Section 8. And I said the district could rob a liquor store to raise money to build a sanitary district. Now, of course, there would be some doctrine that would prohibit that. But the fact of the matter is it would certainly violate the armed robbery statute. But it wouldn't, at least on its face, violate the Sanitary District Act. Now, of course, you couldn't do it that way for a host of reasons. But my point was you could do a bank sale. Maybe, you know, you're right. It should have said bank sale and then we wouldn't be here. But the point I was trying to make. There may be a local ordinance against bank sales. Oh, now you're talking about Fiala 4. The point I was trying to make is that Section 8 is as broad as it could be. It was passed in 1936. It wasn't taken off the books in 1997 when Section 8.1 was passed. It wasn't taken off the books in 2001. It's still on the books today. And it doesn't, contrary to what Mr. Newman says, only apply to creating facilities. It says provide. Yes, sir. I'm sorry. Oh, no, please. Mr. Newman claims that this isn't just reimbursement. This is actually a realization of a profit. Yes, sir. That you haven't just gone from red to black and then stopped. You've gone to very black or a cumulative black. And where in 8 does it say that you're entitled to something more than reimbursement? Section 8 says that the district, in order to provide sewers, can arrange to get the facilities by blah, blah, blah, or otherwise. The or otherwise that they and the FMLP, who was building the houses, reached was we're giving you the permits and you will own them. In fact, it says quite clearly in Section 5J of the annexation agreement, in 20 years, if you still have them, the district can buy them back. That implies ownership. And the freedom that you get from ownership is when you own something, you can sell it for whatever you can get. Mr. Newman and Mr. Ecklund both talked about an ordinance that sets the fees. That sets the fees only for the permits the district retained. And the district didn't retain permits. And it issued them over the years, and it probably still does, for a different part of the district. Permits for what area? Well, there are essentially. For Foxville? No, not for Foxville. There are essentially two areas. What the annexation agreement did is it took the Wasco Sanitary District, as it was in 94, and added an extra area, which I will call Foxville, but now there's other people living there too. But the sanitary district retained 400-and-something permits to cover itself. Now, that area was not something that was really going to be developed in the same way. They weren't going to build tracts of houses. But they kept their permits. And then in 2001, when the Fourth Amendment was enacted, because there was additional capacity determined, not created, but determined, and I'll explain that in a minute, B&B and the FMLP got more permits because usage had been determined more accurately. But the sanitary district still has permits. It probably has them today. And that ordinance that says this is the fee applies to permits that the district issued for itself, for its part of the district. But that ordinance does not apply to the price that the B&B and FMLP defendants could pay, could charge, for a permit that they own. But shouldn't we look at the purpose of that annexation was to create this infrastructure to let B&B recoup its monies and create a strong infrastructure that could be maintained? So if Wasco didn't have the money to pay for it in the beginning, without some of those fees over the cost of the actual building, how are they going to maintain a capital fund? How are they going to maintain these funds that they need to keep this thing going? I'm not sure how they do it now, because FMLP in 2011 or 12 or 13 gave back all the permits, and they're not in this business with the district anymore. How many? How many permits did they give back? Something like that. Gave back or sold back? No, they gave them back. And they did it just before. I think it became effective just before the 20 years ran. The answer to that question, Your Honor, is that the deal that they made was you get the permits, and you get to do whatever you want with them. You can use them to connect your own houses. You can sell them to other people for whatever you can get. It's their property. Mr. Newman keeps talking about public property. After the 1994 agreement, it was not public property anymore. Those permits belonged to B&B, because that is what the agreement said. And that agreement fell clearly within the broad authorization of Section 8. If you look at Section 8, the whole last part of it is penalties for not setting up a sewer system. The legislature thought it was extremely urgent that this get done for public health, and so they gave these districts the broadest possible authority. Mr. Harrison's first attempt at annexation was refused, I think. Right. And so then sometime between his second and that first refusal, there was this reconfiguration of the PEs. Let me, to that, Your Honor, I'm glad you asked. Let me explain how it works with PEs. Mr. Newman is wrong. He talks about them as 3.5 that you're entitled to. You would think that if you moved out of the district, you could take your PEs with you like you take your couch. That's not the case. And Judge Feigerman's opinion in federal court, when he dismissed the case, talks about this, and I commend it to you because he's more articulate than me. Here's the thing. When a house is built, when a sanitary district facility was built, and this was all built back in 94, the IEPA and Illinois law and regulations assign a placeholder number, 3.5 PE. It's a generous number because they do not want to end up short of capacity. Now, capacity for this system has never changed, as Mr. Griffin tells me all the time. From 1994 to now, it is the same capacity. What changes is their knowledge about usage. As I said, 3.5 is generous. But after a house has been online for two years, they look at the usage and they say, well, gee, these people are only using two. And who does that? The IEPA. The IEPA does that. The IEPA. Well, they can all measure it and talk about it, but ultimately it's the IEPA's decision. And the IEPA approves the data and says, you know what? Your usage isn't up here where the placeholder number would set it. It's here. That means you can connect more permits. Isn't there a different number, though, between what the IEPA said and what B&B ultimately said? Well, they may have measured it differently and said so, but ultimately the IEPA. Well, who gets to make that decision? But that's not the decision that was upheld, is it? Yeah. Well, there was no decision upheld about capacity. There really isn't any issue in this case to suggest that the number of permits exceeded capacity. There really is no dispute in this case that the number of permits that is out there is too much for the system. Okay, but your client only got 785. Well, they got more in 2001. Only because of this. Because by 2001, they had seven more years of data and they realized, in fact, there could be more. And in 94, that was contemplated. The 94 agreement says you'll get 785 or a different number as the IEPA may determine. And in 2001, they looked at it, and the district, for its own part of the Wasco Sanitary District, did not need any more permits. Because that part of the district, nobody could build track houses there. There are five. So the additional capacity, in accordance with the spirit of the 94 agreement, was assigned another couple hundred permits to B&B. But there was, after that 97 amendment, an actual construction and reimbursement agreement. That was a different kind of agreement. And that is why Section 8.1 and all this reimbursement agreement stuff simply does not apply. Judge Finas talks about this at length. Well, then why do you call it a construction and reimbursement agreement? Well, because that was an agreement with somebody who didn't build a system. Here is the key to Section 8.1, and this is talked about by Judge Finas in both, I think, in all three of his rulings. Section 8.1 is a permissive provision that can be used to reimburse people who come in and didn't build a system. So you've got B&B or FMLP builds the system, and it's good for their houses, but they know that someday somebody else is going to build some houses to hook into their system. One of the ways you can deal with that is a reimbursement agreement under Section 8.1. But Section 8.1 has no application to FMLP and B&B defendants because they did build the system. But Wasco was supposed to collect those fees and never did. No. Wasco was not supposed to collect those fees because they didn't own the permits anymore. But the statute says that the fees would be under a construction reimbursement would be collected by the same entity. Right. But it was easier, and easier for Wasco because they didn't have to administer it, to collect it directly. Being a public entity is not about what's easier. It's about being a public entity responsible to the people who live there. But the permits belong to B&B, and so they could sell them to this other developer and get compensated. But Wasco could collect them to see what was being collected. Wasco doesn't need to know what's being collected because it's not their money. And this is where all this talk about records, all this talk about records, there are no records. This is why the district, and by the way, the DEC action was filed at a time when only one defendant was on the board. So we had a disinterested majority. They filed this DEC action asking the court to say that it was okay for them to do what they did. And the reason they did that is because of this lawsuit and the challenge that they had. How many people are on the board? Three. Pardon me? Three. The board has three members. And they did have a majority from what time to what time? Who? Who's they? B&B or? No, B&B doesn't have B&B. Okay. Let me rephrase. I think we all know what my question gets at. Yes. Defendants or people who may have had some sort of interest by way of relatives, by way of spouses, by way of neighbors or whatever. This is a good segue into Mr. Newish's issue, which is the conflict. There are only two actions that Mr. Newman challenges, according to Mr. Newman. He says he's not challenging the 94 annexation agreement, but he did for the first seven years in this case. But at that time, no defendant was involved. None of the trustees, Mr. Muscarello, the attorney, not involved. That's from 94 to when? I think Mr. Briswell went on the board in 98. In 2001, the Fourth Amendment was passed, which assigned additional permits as a result of the refigured usage to B&B. It came up at two different meetings in 2000 and 2001. Mr. Briswell was on the board. Mr. Sindelar and Mr. Skidmore were not. They didn't come onto the board for several years after that. So the only action that Mr. Newman challenges, the only person on the board was Mr. Briswell from the Fourth Amendment. And although it was initially considered a 2000 meeting, it was never executed. And when it was approved and executed in 2001, Mr. Briswell did not attend the meeting, and he certainly didn't vote on it. Did you say at that time, 2001, he was the only defendant on the board? He was the only defendant on the board in 2001. Mr. Skidmore and Mr. Sindelar didn't come until later. So when did they have a majority on the board? I think it was about 2006 or 2005. Through? Through 2011, I think, when Mr. Sindelar and Mr. Briswell and Mr. You know, I'm not sure if it's in the brief, Your Honor, but I think it was about 2011 or so when Mr. Skidmore and Mr. 2006 or 2007 when Mr. Skidmore and Mr. Sindelar came on, and they remained on the board. And then Mr. Briswell went off, Mr. Sindelar went off, and Mr. Skidmore remained on the board until 2016. Is there anything contested in the time period 2006 through 2011? Not as far as I know. The two actions that put these permits in the ownership of B&B occurred in 1994 and in 2001. And in 1994, none of them are there. In 2001, Mr. Briswell, the only one on the board, didn't vote. I also want to talk about the relationship of Mr. Briswell that Mr. Newman challenges, because he's really the only one where there is a claim. And, again, he didn't vote when it was executed. But I think he could have, actually, because the only relationship that Mr. Newman challenges, as far as Mr. Briswell goes, is the fact that Mr. His wife is married to Mr. To Mr. Blood. His wife. His wife. And this is Briswell. Is a child. Not, he's not. Oh, yeah. I'm sorry. Yes. Her father. His father alive. And her father is Ken Blood, who is a principal of B&B. The cases we've cited indicate that a wife's interest does not disqualify you unless it is a proxy for the husband. Unless, you know, you put it in her name. But given the fact, first thing, that's never been alleged. And second thing, it seems rather unlikely since the interest came from her father. It's her interest. So there really was no reason Mr. Briswell couldn't have voted on it, but he didn't anyway. So there's no causation as to any of this. Any other questions? Let me take a look. Do I still have? No. Oh, I don't. Sorry. Well, thank you. Thank you. Thank you. Mr. Newman, let me just ask you. One of your accounts is for an accounting. Yes. Tell me what that would accomplish. Find out how much money was stolen. Okay. That's a pejorative, whatever. Just tell me factually what that would accomplish. Factually, it would determine how much funds were diverted. We don't know because the sanitary, as the judge pointed out, the money under the statute, if it was allowed to be transferred, had to go through the district. It didn't. We have no idea other than the documents we have that show dollar amounts on them in order to get the permit that the sanitary district required someone such as Fiala to pay. We don't have all of those documents because the sanitary district doesn't have all those documents. We only have a handful of them. So we have an idea of what they were average charging, and we also know how many homes were built. So by taking kind of the average and the homes that were built, we can come up with a $12 million mark. Now, I want to point out something, a couple of things that I have to respond here. Counsel just got up here and argued so many facts that are not in the record and, frankly, aren't true. I'm not even going to go through all of them, but they're not in the record. And this is a motion for summary judgment and a motion to dismiss. All of these factual assertions that he's making are not contained anywhere in the record. He didn't provide citations to them in his brief, so I asked the courts to look at the briefs when they make these factual assertions and look at what they're citing to, which is nothing. But he said something that's very interesting, and I'm going to make my point here. I know it's being recorded. He said capacity, according to him and according to the vice president of B&B, has not changed since 1994. Remember him saying that. Hasn't changed. That's important because that tells you that B&B hasn't done anything to the district since 1994. They've not added anything. They've not done anything. Why is that important? Go back to the very first thing that I said here. This 1994 annexation agreement is a contract. That's as simple as this case gets. It is a contract. The contract required B&B to build something, and in return they got something. Now, capsule just got up here, and I don't like to use the word lie, but he misrepresented what the annexation agreement says. Because in the record, and it's page 23 of the annexation agreement, I want to read to you the important part. It says that B, and I'm going to paraphrase here, but it says B&B is going to get a total aggregate not to exceed 2,748 PEs. And it says the same for the connection permits. It's separate from the vision in there for the connection permits. The notion that this agreement gave him everything that the district creates is nonsense. The agreement does not say that. It says the exact opposite. The document doesn't lie. But the defendants are really loose with the facts. Again, section 8, when you're talking about section 8, I will say this for the 30th time here. I put it in the complaint. I put it in every brief. I have never, ever argued that the 1994 annexation agreement is invalid for any reason. I have argued that section 8 is the statutory authority to create the 1994 annexation agreement. But the public trust document, which, again, they didn't even respond to. It doesn't allow them to do what happened here. Once the annexation agreement was entered into and they had 748 connection permits and these PEs, that's it. The agreement's in place. They get those. And I've never contended that they don't get them. But what they don't get are the fees that the Washington Sanitary District charged to people wanting to connect. They didn't buy that. And that's not part of the ordinance. Just like they could sell their property, in which case, and I'll make up the number because I don't know the number, but if they bought this hundred acres of land for a million dollars and they split it up, do an easy math, into a hundred parcels. So each one of those hundred parcels would be worth $10,000. That's the cost that they paid. They went to the Sanitary District and they got the Sanitary District involved and they had water and sewer, which makes the property more valuable. They sold that property for $50,000 an acre or more. So they have the ability to sell that property for anything they want. It's a free enterprise system. And if they paid $1.2 million to build the Sanitary District, like every other business in the United States that's not fraudulent, they could get that money back by charging the customers those costs in their expense. They're permitted to do that. They could have charged anything they wanted. But that's not what they did. They acted as if this was a reimbursement. And I know the reason they did that, because they didn't want to probably pay taxes on it. But they acted as if they treated this like a reimbursement. And they took funds which weren't part of the original annexation agreement. That's just not something that they're permitted to do. And the final thing, if I may just have 10 seconds. Nobody has talked about the water fee because the annexation agreement, and Section 8, by the way, that they're saying this gives us the authority, does not apply to water. Section 8 says that it is to provide for sewers and plants. It's a completely separate section. And my last point, which I'm going to walk away from, Justice, is the intention of this $12 million, if you look at the statute involved here, how broad it is, it says, Every such sanitary district shall proceed as rapidly as reasonably possible by construction, purchase, lease, or otherwise to provide sewers. So they're supposed to do all this stuff to provide sewers. So I'm asking the panel this. Tell me how taking $12 million from the public in any way provided sewers. That's why the act doesn't apply. It's for the creation of the sanitary district, not to steal money from it. Thank you. The case will be taken under advisement, and hopefully we won't lose any hair over it. We'll take a short recess.